[891 NYS2d 862]

In the Matter of RAYMOND A., a Child Alleged to be Neglected. MELISSA R., Respondent.

Family Court, Kings County, March 30, 2009

## APPEARANCES OF COUNSEL

*Administration for Children's Services*, Brooklyn, (*Jeanne Aronson* of counsel), for petitioner. *Brooklyn Family Defense Project*, Brooklyn (*Lynn Vogelstein* of counsel), for respondent. *Legal Aid Society*, Brooklyn (*Amy Licht* of counsel), for the child.

## OPINION OF THE COURT

BRYANNE A. HAMILL, J.

### Background

On January 23, 2009, the Administration for Children's Services (ACS) filed this petition against Melissa R. (hereinafter the mother), pursuant to article 10 of the Family Court Act. The petition alleges that the subject child, Raymond A. (hereinafter subject child or Raymond), born on January 1, 2009, is a neglected child as defined by Family Court Act § 1012 (f) (i). The relevant portion of the statute defines a neglected child as a "child less than eighteen years of age . . . whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care." (Family Ct Act § 1012 [f] [i].)

ACS alleges that a finding of neglect was entered against the mother on January 4, 2005 as to her other children, Malajah and Donye. Upon information and belief, the source being Vonda Akinduyi, a Leake and Watts Services, Inc. caseworker, the respondent mother's parental rights for Malajah were terminated on July 17, 2008 by the Bronx County Family Court, and proceedings concerning her parental rights to Donye are still pending. The petition further alleges her failure to comply with previous service plans and concerns regarding her mental health, including noncompliance with prescribed medications and failure to attend therapy sessions.

Raymond, who was born prematurely on January 1, 2009, remained in the hospital until January 19, 2009 and was subsequently released directly to the care of his mother, who

was at the time residing at Kianga House, a shelter for mothers and babies. On January 23, 2009, when ACS filed this instant petition and requested a removal and remand of this newborn, Raymond's mother and attorney consented, and he was placed in kinship foster care with his maternal aunt. At the same initial appearance, she requested a hearing, pursuant to Family Court Act § 1028, for the return of Raymond to her care. Family Court Act § 1028 (a) states, in part: "Except for good cause shown, such hearing shall be held within three court days . . . [to determine whether] the return [of the child] presents an imminent risk to the child's life or health." All parties consented to calendaring the section 1028 hearing for January 29, 2009 at 9:30 A.M. There was no challenge by the mother to ACS's removal application at her initial appearance, upon which she would have been entitled to an immediate hearing, pursuant to Family Court Act § 1027.

On January 29, 2009, the parties informed the court that they believed that the respondent's Family Court Act § 1028 application would be settled with a parole of the child to the mother, under certain conditions. This assumption was based upon the service plan that was agreed to at the family conference which ACS held the day before. Counsel for ACS and respondent requested that the case be put on a recall for later that day, because ACS was waiting for the approval from the Deputy Commissioner, who was not present at the conference, to parole the child. The case was recalled at 2:30 P.M., at which time the court was informed that as per the internal ACS policy, child safety alert No. 14,* neither the Deputy Commissioner nor the Deputy Director would consent to the parole of the child. As such, upon the consent of the mother, the hearing commenced on January 30, 2009 at 9:30 A.M. At the conclusion of the section 1028 hearing, the respondent made a prima facie motion asking the court to grant her section 1028 application based upon the petitioner's failure to set forth a prima facie case of imminent risk. This written decision follows this court's oral decision rendered on January 30, 2009, which granted the mother's application, supported by the attorney for the child.

### Discussion of Testimony and Evidence

At the hearing, ACS called only one witness to testify, its caseworker Shreshtha Ramsumair. The court fully credits Ms.

---

* Child safety alert No. 14, revised on April 21, 2008, is an Administration for Children's Services policy regarding safety planning for newborns whose siblings are already in foster care as a result of abuse or neglect.

Ramsumair's testimony, which was ultimately favorable to the mother and unfavorable to ACS. ACS failed to call Ms. Akinduyi, the caseworker assigned to the mother's open neglect case in the Bronx and the provider of the information in the oral report transmittal (ORT). ACS also failed to call Mr. Minucci, the mother's treating therapist, and Dr. Blum, the mother's previous treating psychiatrist. The following exhibits were entered into evidence:

Petitioner 1—ORT dated January 21, 2009

Respondent A—Mr. Minucci's letter dated January 26, 2009

Respondent B—Kianga House's letter dated January 27, 2009

Respondent C—Samantha Box's letter

Respondent D—Laura Melendez's letter dated January 27, 2009

Respondent E—petition.

ACS requested that the court take judicial notice of the mother's prior neglect findings, which ACS represented as resulting from the mother's diagnosis at age 16 of depression and bipolar disorder, for which she was prescribed Depakote, and her refusal to comply with previous service plans that had been put in place. The court declined to do so, as no Bronx County Family Court documents and orders were available to the court (§ 1028 hearing tr at 166, Jan. 30, 2009).

Ms. Ramsumair was assigned to the mother's case on January 22, 2009 following the receipt of the ORT on January 21, 2009. The source of the allegations contained within the ORT was Ms. Akinduyi, a caseworker with Leake and Watts, assigned to the mother's pending Bronx case.

Ms. Ramsumair testified that the ORT stated Raymond's birthdate as January 19, 2009, but it was later revealed during her investigation that Raymond's birthdate was in fact January 1, 2009 (§ 1028 hearing tr at 10, Jan. 30, 2009). Her investigation further revealed that there were two indicated cases against the mother, one in January 2001 for marijuana use, and in December 2002 for throwing an empty soda can at Donye, who was a year old at the time, and the children are still in foster care (§ 1028 hearing tr at 12, 13, Jan. 30, 2009).

Ms. Ramsumair also testified that ACS had made an unannounced visit to the mother on January 22, 2009 and found her to be immediately cooperative and willing to answer any and all questions, including those about her two other children. Ms. Ramsumair further testified that the mother was crying because

ACS was in the house wanting to take her newborn "but she was calm and she was willing to answer any questions I had" (§ 1028 hearing tr at 24, Jan. 30, 2009). Ms. Ramsumair testified she "observed baby formula . . . ample clothes, diapers, he seemed comfortable in her arms" (§ 1028 hearing tr at 47, Jan. 30, 2009). During this visit the mother herself volunteered the information about her mental health and her prescription for Depakote and therapy. Ms. Ramsumair also testified that the mother's sister and Raymond's putative father appeared to be a strong support network for her, and wished for Raymond to be in his mother's care and custody.

Ms. Ramsumair further testified that according to conversations with Ms. Akinduyi, she was told that the mother had previously been noncompliant with prescribed medication and did not attend therapy sessions and was not currently engaged in mental health services. However, at the January 22, 2009 visit, the respondent mother insisted to Ms. Ramsumair that she had complied with the medication requirements and had been weaned off the medication at the direction of Dr. Blum, her treating psychiatrist at that time (§ 1028 hearing tr at 42, Jan. 30, 2009). The respondent had further maintained that she had completed her anger management course as part of the previous service plan (§ 1028 hearing tr at 36-37, Jan. 30, 2009). Ms. Ramsumair testified that a family conference was held on January 28, 2009, at which the mother was present, with her sister Jasmine R.; a housing advocate, Ms. Dicks; the caseworker from Leake and Watts, Ms. Akinduyi; ACS supervisor, Debbie Samuels; the CES specialist, Mr. John Akoowey; and paralegal Wanda Chamber and Ms. Samantha Hayes from the Legal Aid Society. The mother told ACS during this family conference of her previous diagnosis of depression and bipolar disorder and her prescription for Depakote, approximately three years ago. The parties agreed to a service plan, whereby Raymond would be paroled to the mother and the mother would continue with therapy, complete a parenting class and follow up with Raymond's pediatrician and early intervention. Raymond's mother was also willing to undergo a mental health evaluation, if deemed necessary.

However, the next day ACS informed Ms. Ramsumair that ACS would not consent to the parole of this infant. She testified that the basis for the imminent risk determination came from ACS's concern that due to the mother's alleged noncompliance with therapy and medication, the infant would be at risk in her

care. When asked if there were any specific concerns related to the infant himself, Ms. Ramsumair answered "No" (§ 1028 hearing tr at 32, Jan. 30, 2009).

Cross-examination of Ms. Ramsumair revealed that the information in the ORT was in fact incorrect, and Ms. Akinduyi had not had any communication with the mother in a long time and had no up-to-date information (§ 1028 hearing tr at 68, 73, Jan. 30, 2009). Ms. Ramsumair was asked, "And in fact in the course of your investigation you've learned in fact that nothing that Ms. Akinduyi told you was in fact true, correct?" Witness answered, "Correct" (§ 1028 hearing tr at 57, Jan. 30, 2009).

Further cross-examination also revealed that the respondent mother had in fact complied with the service plan, consisting of completing anger management and parenting class; she had been weaned off her medication Depakote in a clinical setting due to adverse side effects three years ago; and she continues to have therapy with Mr. Minucci at MCCNY, who had been treating her for three years.

This mother had supplied Ms. Ramsumair with contact details for Mr. Minucci. Ms. Ramsumair testified that she had exchanged e-mails with Mr. Minucci confirming the respondent mother's treatment over the last three years (§ 1028 hearing tr at 41, Jan. 30, 2009). Mr. Minucci's letter in evidence demonstrates his opinion as her therapist that Raymond should stay with his mother as she is making "tremendous progress in her individual counseling . . . she's committed to continuing in individual therapy . . . and that he is committed to continuing as her individual therapist . . . [and] has no safety concerns about her ability to care for Raymond." (Respondent's exhibit A.)

Ms. Ramsumair testified that the mother had also asserted she was free from drugs and alcohol and was willing to take a drug test; but since the filing of the petition, ACS had not made a referral for such a test. Ms. Ramsumair testified that she did not believe that the respondent needed to submit to a drug test (§ 1028 hearing tr at 40, Jan. 30, 2009).

Ms. Ramsumair testified that ACS caseworker Marie Joseph had made visits to the mother's home in the shelter and had found adequate provisions. Ms. Joseph spoke to Kianga House's night staff, Ms. Wright, who informed Ms. Joseph that Ms. R. had done everything necessary to prepare for Raymond's birth and that she was an excellent resident at the shelter (§ 1028 hearing tr at 52, Jan. 30, 2009). Ms. Ramsumair further stated that she personally had a conversation with Ms. Wright, who

said that the respondent has never shown any signs of erratic behavior (§ 1028 hearing tr at 53, Jan. 30, 2009).

Ms. Ramsumair further testified to the emotional attachment Raymond had made to his mother. On cross-examination, she testified as to the premature birth of Raymond, his mother's daily visits to the hospital, the hospital staff's opportunity to observe the mother and baby, how his mother had visited him every day while he was at her sister's home since the remand, and how she observed that the mother and child seemed happy together. Ms. Ramsumair also reported that she had been trained to assess the attachment between the mother and child, "to observe the bond between them. If the child is comfortable in the mother's arms, not crying, you know there's a bond between the mother and child" (§ 1028 hearing tr at 49, Jan. 30, 2009). Additional evidence from Kianga House (respondent's exhibit B), Samantha Box, a volunteer at the mother's previous shelter Sylvia's House (respondent's exhibit C), and Laura Melendez, a counselor at Sylvia's House (respondent's exhibit D), all displayed positive reports of the mother being a

> "cooperative member of the community . . . she made all necessary provisions for the baby prior to his birth . . . in the opinion of Kianga House, Ms.[R.] was taking excellent care of Raymond since they returned home from the hospital . . . that Ms. [R.] has done everything that she needed to do in order to obtain permanent housing" (§ 1028 hearing tr at 65, Jan. 30, 2009).

Ms. Ramsumair testified that at the family conference on January 28, 2009, Ms. Akinduyi confirmed that she had not worked with the mother for some time, and in fact on perusing Ms. Akinduyi's case file concerning the mother's older children, Ms. Ramsumair found very little documentation of any communication between Ms. Akinduyi and the mother; the agency's communication had been largely with the foster parents. Further, Ms. Ramsumair reported that the case was filed pursuant to child safety alert No. 14 (§ 1028 hearing tr at 70, Jan. 30, 2009), and she said she was directed to remove the child before she could "finish my investigation" (§ 1028 hearing tr at 83, Jan. 30, 2009). According to Ms. Ramsumair, the requirements of an ACS caseworker with respect to child safety alert No. 14 are to "hold the conferences to develop a safety plan for the child. We have to consult with—have meetings with the foster care agency as to the prior cases. If we need to have a mental

health consultant to be there, to be present, to ask questions there should be one" (§ 1028 hearing tr at 87, Jan. 30, 2009).

When asked by the court if the ACS mental health consultant was present, the witness stated no, that they did not have a child safety conference but a family conference, and the mental health professional was not available to consult. When questioned further as to the type of conference that was held, Ms. Ramsumair revealed that the goal of the family conference is to reach an agreement for both a service plan and for whether the child can remain at home. Ms. Ramsumair testified that at the family conference for this mother, it was agreed that the child remain at home with the mother, who agreed to a service plan (§ 1028 hearing tr at 87-89, Jan. 30, 2009).

### Analysis

Family Court Act § 1028 states, in part:

> "(a) . . . the court shall grant [an] application [by the parent or other person legally responsible for the care of child], unless it finds that the return [of the child] presents an imminent risk to the child's life or health.
>
> "(b) In determining whether temporary removal of the child is necessary to avoid imminent risk to the child's life or health, the court shall consider and determine in its order whether continuation in the child's home would be contrary to the best interests of the child and where appropriate, whether reasonable efforts were made prior to the date of the hearing to prevent or eliminate the need for removal of the child from the home and where appropriate, whether reasonable efforts were made after removal of the child to make it possible for the child to safely return home."

ACS child safety alert No. 14 policy mandates that as soon as the case planner learns of the mother's pregnancy, and throughout the pregnancy, the case planner must conduct an assessment to determine if it would be safe for the newborn to reside in the home. A meeting with the family and service provider should be conducted. Further, as soon as the child is born or discovered, the case planner must call the Central Register of Child Abuse and Maltreatment and a child protective specialist (CPS) will be assigned to do a full assessment of the safety of the new child in the home and an elevated risk conference will be convened. With regard to the investigation, the

policy further states that it is critical for the child protective specialist and the foster care and/or preventative case planner to share and discuss information with one another immediately, as soon as it is known that the mother is pregnant. The investigation should review the family's current services and needs and ability to care for the child. This information is to be discussed at the elevated risk conference, which is to be convened immediately after the child's birth/discovery. Further, it is the policy that the Deputy Child Protective Borough Commissioner shall make a real-time safety assessment regarding the newborn, based on the familial history and current information, with the safety and risk factors reviewed at the time of the newborn's birth.

The Court of Appeals in *Nicholson v Scoppetta* (3 NY3d 357, 381 [2004]) has held that "[determining] whether a child is in 'imminent danger' is necessarily a fact-intensive determination." The Court of Appeals further stated that in making the determination that imminent risk exists, it is

> "sufficient if the officials have persuasive evidence of serious ongoing abuse and, based upon the best investigation reasonably possible under the circumstances, have reason to fear imminent recurrence. Since this evidence is the basis for removal of a child, it should be as reliable and thoroughly examined as possible to avoid unnecessary harm to the family unit." (*Id.* [internal quotation marks and citations omitted].)

In the case at bar, Ms. Ramsumair's own testimony highlights ACS's failure to establish imminent risk to the child, their additional failure to make reasonable efforts to prevent the removal of the infant from his mother, and their failure to even follow ACS's own protocol set forth in child safety alert No. 14.

Ms. Ramsumair testified that she had been unable to see full documentation of the previous case and was still awaiting receipt of files (§ 1028 hearing tr at 74, Jan. 30, 2009). In fact, at the time of the filing of this petition, ACS was still not fully informed as to the particulars of the previous neglect findings, other than what had been said by Ms. Akinduyi (§ 1028 hearing tr at 79, Jan. 30, 2009). Further, when the mental health of a parent is in question, Ms. Ramsumair testified that it is ACS policy to arrange for a consultation by a mental health professional. No such consultation was made in this case (§ 1028 hearing tr at 76, Jan. 30, 2009). Additionally, it was established that

the mother had been open and honest with the ACS about her pregnancy throughout, giving ACS ample opportunity to investigate her current service needs and her ability to care for her newborn child; no full investigation was done.

Further, as testified to by ACS's witness, the allegations in the petition relied largely on information given by Ms. Akinduyi. The evidence revealed that the allegations proved to be false, and the mother provided evidence to demonstrate the change in circumstances since the previous findings of neglect. In addition, her compliance with the service plans that had been put in place, regarding the medication, anger management and therapy, clearly mitigates any risk stemming from her mental health.

In considering an application, pursuant to Family Court Act § 1028, "[t]he court *must do more* than identify the existence of a risk of serious harm . . . It must balance that risk against the harm [continued] removal might bring, and it must determine factually which course is in the child's best interests." (*Nicholson* at 378.) It is undisputed that this mother and her infant have formed a strong bond; she visited him every day at the hospital and continued to do so at her sister's home. The caseworker herself observed the bond between the mother and child and spoke of the impact on the infant's emotional health of severing such a bond (§ 1028 hearing tr at 48-49, Jan. 30, 2009). Here, the risk of emotional harm in continuing the removal significantly outweighs any risk to the infant being in the mother's care and custody under these facts and circumstances.

The Court in *Nicholson* further held that the imminent danger has to be "near or impending, not merely possible" and that "[t]he term 'safer course' should not be used to mask a dearth of evidence or as a watered-down, impermissible presumption." (3 NY3d at 369, 380.)

This court finds that upon examination of the application of ACS's internal policy, child safety alert No. 14, it is a blanket safer course policy, which was rejected by the Court of Appeals in *Nicholson* and this court in *Matter of Abraham P.* (21 Misc 3d 1144[A], 2008 NY Slip Op 52498[U] [Fam Ct, Kings County 2008]). For instance, the policy states, "When a child has siblings in foster care, Children's Services has already determined that it is unsafe for older siblings to be in the home. There must be a presumption that safety factors exist that require removal and appropriate court action needs to commence to protect the new child." (Child safety alert No. 14, Apr.

21, 2008, at 2.) This presumption is misplaced and ignores the reality that many of New York's foster care children come from impoverished homes and may remain in foster care, in large part, due to the foster care funding that family members who serve as foster parents receive to support them.

Further, upon review of this policy, it states that while the case planner has the responsibility to work with the family and assess any ongoing safety issue, the ultimate decision to file the petition and seek the removal is made by the Deputy Child Protective Borough Commissioner, who here had no knowledge of this family, apart from a perusal of the incomplete investigation. The caseworker had no choice but to follow her supervisor's instructions against her own professional judgment, to file the petition seeking the removal of this infant from his mother at the shelter.

This hearing also demonstrates ACS's numerous departures from its own protocol as well as its failure to make reasonable efforts to avoid the removal of Raymond from his mother, which are required. The Second Department in *Matter of Amanda Lynn B.* (60 AD3d 939 [2009]) held that contrary to the Family Court's determination, ACS failed to establish any imminent risk to the child's life or health by remaining with the grandmother, who had custody of him for 12 years, and that ACS failed to make reasonable efforts prior to the hearing to prevent or eliminate the need for removing the child from the home.

Here, ACS failed to convene an elevated risk conference and to complete a full risk and safety assessment of the newborn in the home. The policy explicitly states a critical need for the CPS, foster parents and/or preventive case planner to share and discuss information with one another immediately upon knowledge of the mother's pregnancy or the birth of the child. Ms. Ramsumair testified that she and her colleagues were unable to reach Ms. Akinduyi. Ms. Akinduyi herself was unaware of the mother's current situation and stated at the family conference that she had not spoken to the mother in some time and was unaware of what progress had been made. There was no review of the facts and circumstances surrounding this family; in the event there had been, this mother's ability to care for Raymond would have easily been ascertained.

However, due to ACS's policy requiring the approval of the Deputy Child Protective Borough Commissioner to parole a child to a parent during the pendency of the new afterborn petition, ACS's de facto determination, without a careful family-

specific analysis, is that there is imminent risk (child safety alert No. 14, revised Apr. 21, 2008, at 2), and that Raymond should be removed from the care and custody of his mother.

The Second Department in *Matter of Jeremiah L.* (45 AD3d 771 [2d Dept 2007]) held that evidence adduced at the Family Court Act § 1028 hearing did not establish an imminent risk to the life or health of the subject children. "The petitioner's caseworker testified at the hearing that the children were not in imminent danger and that there was no need for their removal." (*Id.* at 771.) The caseworker in *Matter of Jeremiah L.* testified that "when observed, the mother's living conditions were appropriate and neat and organized, that both children were clean and appropriately dressed . . . and that their basic needs for food, shelter, and clothing were being met. There was no evidence that either parent abused the children, abused alcohol or other substances." (*Id.* at 771-772 [internal quotation marks omitted].)

Similarly in the case at bar, when the ACS caseworker was asked what provisions for the baby were found in the mother's home, she stated, "A bassinet, Enfamil, Pampers and clothes" (§ 1028 hearing tr at 54, Jan. 30, 2009). Further she testified that in her view as a child protective specialist caseworker, there was no imminent danger to Raymond in the care and custody of his mother (§ 1028 hearing tr at 93, Jan. 30, 2009).

## Conclusion

Contrary to ACS's request, the court does not enforce its policies, but must interpret and apply the law to the case before it. In this case, the court finds that ACS has failed to meet its burden of showing that there is a substantial probability Raymond would be in imminent danger or in imminent risk to his life or health if returned to the care and custody of his mother. Further, the risk of emotional harm to this infant in continuing the removal significantly outweighs any risk in returning Raymond to his mother's care. As a result, factually it is in Raymond's best interests to be returned to his mother's care. Furthermore, the court finds that ACS failed to make reasonable efforts to avoid the removal of this child.

Accordingly, the mother's application for the return of her son, pursuant to Family Court Act § 1028, is hereby granted. Raymond is paroled to her during the pendency of the proceedings with weekly ACS supervision, under the following terms and conditions that she:

(i) continue to participate with her individual psychotherapy,

(ii) participate in an early intervention assessment of Raymond, and

(iii) ensure the infant's needs are fully met.